# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 6, 2012 Session

## FRANKLYN NATHANIEL MORGAN v. KANDI TONYELLE MORGAN

**Appeal from the Circuit Court for Greene County**
**No. 09CV665      Thomas J. Wright, Judge**

---

**No. E2011-00164-COA-R3-CV-FILED-MAY 30, 2012**

---

Franklyn Nathaniel Morgan ("Father") filed this divorce action after his spouse, Kandi Tonyelle Morgan ("Mother"), was hospitalized because she had ingested an overdose of medication. Father was given temporary custody of the parties' daughter who was four years old when the parties separated. Mother then obtained temporary custody based on proof that the Father allowed the marital residence to become filthy and dangerous. After a hearing, the court entered a temporary parenting plan based on "week-about" parenting. After a trial, the court made Mother the primary residential parent during the school year and Father the primary residential parent during the summer. The court also awarded Father parenting time during the spring break and two-thirds of the Christmas break. The court further ordered that Father would pick up the child after school and exercise parenting time from then until he went to work at 6:00 p.m. on his workdays, or until 7:00 p.m., when Mother got off from work on her workdays. Mother had 252 parenting days and Father had 113. The court set Father's child support according to the Child Support Guidelines ("the Guidelines"), but allowed Father a downward deviation of $30 per month based on the extra parenting time after school, which the court found was not taken into account by the Guidelines. Mother appeals. We modify the judgment to designate Mother the sole primary residential parent. In all other respects, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Sandra Lee Stanbery-Foster, Greeneville, Tennessee, for the appellant, Kandi Tonyelle Morgan.

Brent Hensley, Greeneville, Tennessee, for the appellee, Franklyn Nathaniel Morgan.

## OPINION

### I.

This is a contested divorce action filed by Father. Mother's brief on appeal – rather than concentrating on the evidence presented at trial and demonstrating how the trial court's factual findings are wrong or how the trial court reached an erroneous conclusion of law – consists of approximately 39 pages of accusations against Father and three pages of general law applicable to all divorce actions. Mother apparently believes that if she gives this Court all the "ammunition" she has against Father, we will do the harm to Father she could not do in the trial court. She purports to present eight numbered issues for appeal but skips numbers five and six completely. Her arguments bear no correlation to the issues. We would be justified in dismissing this appeal for lack of briefing that complies with Tenn. R. App. P. 27(a)(7). *Utter v. Sherrod*, 132 S.W.3d 344, 352 (Tenn. Ct. App. 2003). We will, however, in the hope of serving justice, attempt to make some sense out of her case. *Id*. (it is not error to consider issues that have been waived); *see* Tenn. R. App. P. 36(b)(court may consider an error that was not raised in the trial court in the interest of doing substantial justice).

The parties were married May 7, 2005. Their only child, Scilar Abbygail Morgan, was born on September 26, 2005. After a disagreement between Mother and Father on October 31, 2009, that resulted in harsh name calling, Mother took an overdose of Ibuprofen. She sent text messages to several people stating that she could not live like this anymore. She was found in her vehicle in a stupor and taken to a local hospital emergency room. The emergency room physician committed her to a psychiatric medical center. She was discharged November 3, 2009.

Father and his parents took care of Scilar while Mother was hospitalized. Father allowed Mother to have Scilar after school on November 3, 2009, with the understanding that the maternal grandmother would be present and that Father would pick Scilar up at 9:00 p.m. the same day. Father filed this action the next day, November 4, 2009, along with an affidavit stating that Mother would not allow him to have Scilar back as agreed and that, with Mother's emotional problems, Father feared for Scilar's safety. The court entered an ex parte order giving Father temporary custody of the child. Eventually, Mother filed an answer and counterclaim.

In December, the parties, pending the divorce hearing, reached an agreement through mediation as to some aspects of their relationship. They agreed to lift the requirement in the ex parte order that Mother's visitation with Scilar be supervised. Mother agreed not to enter

the marital residence where Father resided with Scilar. They agreed that Mother would pick Scilar up for her parenting times at the marital residence and return her to the marital residence.

On or about March 8, 2010, Mother filed a motion for emergency custody based on filthy and dangerous living conditions in the marital home. She supplied an affidavit and over 100 pictures that she took of the inside of the marital residence on March 4, 2010. The court entered an order making Mother the primary residential parent pending a hearing and ordered Father to "immediately rectify the filth he has created and allowed to accumulate in the marital residence." The court appointed a guardian ad litem ("the GAL") for Scilar and ordered that the GAL approve any home where Scilar would be spending time.

The court held an evidentiary hearing on March 19, 2010. Father did not testify but conceded that the conditions at the house were not acceptable. Mother admitted that upon seeing sharp objects such as knives and razors, she did not put them away. She further admitted that she did not clean up the mess because she wanted to show what kind of parent Father was. Mother also testified that she had frequently found Scilar's "bottom" to be red and irritated after visitation with Father.

Mother presented testimony from one police officer who had received a report from his dispatcher of a child unattended in a vehicle. The call had come to the dispatcher, reportedly from someone in Mother's family. The officer confirmed finding Father in the parking lot of a liquor store, and, when confronted, Father "admitted leaving the child in the vehicle but told me that someone he knew had stood by the truck and watched the child while he went in."

During Mother's testimony, which was lengthy and often strayed from the subject at hand, the court stated: "I'm done. I've had enough. This is an emergency hearing. I've had plenty," after which the court announced its findings. The court found that the marital home was unacceptable at the time the photographs were taken but, as of the day of the hearing, "was in a safe condition at this point." The court ordered that any home in which Scilar resided would be investigated by the GAL. The court ordered that the parties have co-parenting time on a "week-about basis." The court ordered that during their parenting times, the parties "not have any alcohol around the child." The court ordered that Father, who is a volunteer fireman, not take Scilar on calls. The court further ordered "that the parents will participate in family therapy with the child as requested by the therapist."

The trial occurred on July 1, 2010. The court heard lengthy proof and did not adjourn until announcing its findings from the bench at approximately 8:30 the evening of the trial in a ruling now found in a 30-page memorandum opinion. As we have indicated, Mother's

brief only sporadically mentions the evidence at trial and certainly does not provide a helpful understanding of the evidence presented there. The following is our summary of the evidence after a complete review of the record.

During the trial, the parties stipulated that grounds for a divorce existed. The court granted a divorce to both parties on these stipulated grounds.

The marital residence is a mobile home on approximately 1.5 acres of land. The combined value of the mobile home and lot as of the date of trial was $32,000. The parties had agreed to purchase the land from Mother's grandmother for $15,000 but had not paid her any money toward the debt. The parties had purchased the mobile home with the help of Mother's grandmother. She co-signed a note for them and made payments when they did not. As of the date of the trial, the note had been paid except for approximately $1,000. Mother's grandmother had paid $5,680.03.

Father was the occupant of the marital home between the time he filed this action and April 15, 2010, when he moved into his parents' residence. Mother lived with her parents until Father moved out of the marital residence. She moved into the marital residence on May 1, 2010. Father did not pay anything on the mobile home mortgage during the time he lived there.

By the time of trial, the parties had divided their personal property with the exception of a refrigerator and a motorized "scooter." The scooter was several years old and had been damaged in an accident but remained operable. Father testified that the scooter was worth approximately $1,000.

During the marriage, Mother worked part-time as a hairdresser. While the divorce was pending, Mother became employed full time. She works from 10:30 a.m. to 7:30 p.m. Her weekday work schedule varies, but she must work every other weekend. Mother makes $1,232.31 monthly. Father earns $2,071.42 monthly. He works three twelve hours shifts from 6:00 p.m. to 6:00 a.m. His workdays vary.

Father and Mother are both occasional drinkers. Mother, her sister, her mother, and her grandmother all assert that Father has a "drinking problem," but none of them had ever seen Father intoxicated or seen him drink in front of Scilar. The photographs taken for the hearing on Mother's emergency motion for custody show numerous empty beer containers in the residence. Father admitted drinking a little more than usual for a short time after the divorce action was filed, but denied ever drinking in the presence of Scilar. He admitted taking Scilar to one family dinner in a restaurant that served beer and that his father and grandfather had one or more beers with their dinner.

-4-

After being ordered to participate in therapy, Father attended only one session. The therapist attempted on at least one occasion to contact Father. Father did not call the therapist back. He claimed that he lost the therapist's number and then forgot to call the therapist. Father also testified that he had dealt with the primary problem the therapist related to him – that of Scilar hearing "monsters" – by finding the "monsters" and explaining them to Scilar. According to Father, the "monsters" were cats that walked on heating and cooling ducts and made noises that scared Scilar.

The therapist admitted that there was nothing inappropriate about Father's interaction with Scilar, but the therapist formed an opinion that Father lacked maturity. The therapist testified that when she raised concerns with Father about the effect of the divorce on Scilar, Father stated, "She's smart. She'll figure that out on her own." The therapist had several meetings with Mother and members of Mother's family. During the meetings, she heard criticism of Father in Scilar's presence from Mother and members of her family. The therapist denied that conducting the sessions in such manner would have a negative impact on Scilar's impression of Father. The therapist testified that the child is more comfortable around Mother than Father. The child is "nervous" around Father and does not feel comfortable and safe around Father.

During cross-examination of the therapist, Father's counsel asked whether Mother had disclosed to the therapist about Mother's romantic involvement with a man to whom Scilar became very attached. The therapist testified that Mother did not disclose that relationship and testified that such a relationship would have a negative impact on Scilar.

Mother admitted writing a letter dated March 19, 2007, professing her love to a man who lived in the marital home for approximately a month. At the time she wrote the letter, the man was incarcerated. Mother claimed that she did not know why the man was incarcerated. In the letter, she spoke of kissing the man on a night she went out with the man and another male friend of his and they "got me drunk." In the letter, she stated, "I guess what I'm trying to say is that I have strong feelings for you and not just me, but Scilar, too." She asked the man where he stood and informed him "my marriage is over and has been for a long time now." With regard to her daughter, Scilar, Mother stated in the letter, "[i]n case you haven't noticed, it wouldn't be hard for Scilar to love you. She already yells for you as much if not more than her daddy." Mother admitted telling Father that having another woman around Scilar "better not happen." She also admitted she did not tell the therapist about Scilar's attachment to the man when they were dealing with the child's anxiety about the separation and divorce. Mother's counsel did not object to Father's questions concerning the letter or her feelings for the boarder.

There was a lot of testimony at trial concerning Scilar's resistance to going with Father when the parties met to transfer physical custody of the child. Mother's family members testified that during the early stages of the separation, Scilar resisted going to Father by screaming and yelling and telling Father that she hated him. By all accounts, Scilar's attitude by the time of trial had improved to the point that she seldom, if ever, resisted the exchange. Mother offered the explanation, when she was re-called as the last witness, that Father had spent most of Scilar's childhood working or sleeping and that the child had gotten better because, after the separation, she had been able to spend more time with Father. Mother readily admitted that both Scilar and Father need a relationship going forward. Mother testified that she thought Father should have Scilar every other weekend and one or two days during the week. The GAL recommended that the parenting arrangement continue on a "week about" basis.

Mother's sister attempted to testify about seeing Father being violent toward Mother in 2007. The court sustained an objection to the relevance of the testimony upon observing that counsel for Father "went through in great detail with Ms. Morgan all the complaints that she had against Mr. Morgan. And that was not among them." Mother had testified earlier and made no mention of Father being violent toward her. Mother made no offer of proof.

There was considerable testimony from Mother and her family that Scilar often came back from Father with a chaffed or irritated "bottom," *i.e.*, the area in the vicinity of her anus and genitals. Apparently, after a thorough cleaning and application of a topical ointment, the irritation improved There was no expert testimony concerning the cause of the irritation. However, Mother's mother testified that another female member of the family is highly sensitive to the point that even as an adult she will experience a sort of rash, absent meticulous cleaning and application of an ointment.

As we have indicated, the court's opinion is lengthy. We will attempt to condense it to its salient points. The court ordered that the opinion announced from the bench be transcribed and attached to the order. The decision continued. The parties have already divided the personal property and debt with minor exceptions. Mother is awarded the refrigerator. Father is awarded the scooter and any debt on the scooter. Mother is responsible for two small personal loans she has incurred. Father is responsible for $604 the couple borrowed from Mother's grandmother to purchase or repair a truck Father drives. Father is responsible for a small personal loan.

The value of the real property is $32,000. Mother is awarded the real property and is responsible for the debt owed on that property. The debt is $16,000 for the land, and $5,680.03 owed the Mother's grandmother for payments she made on the mobile home. Mother will have approximately $10,000 equity in the real property.

The court found that both parents have problems that raise concerns. The court was as troubled with Mother's letter to her male boarder as with any of the issues she raised against Father. The court also believes that Mother is as much out to get Father for taking Scilar away from her through the ex parte order as she is trying to protect Scilar. As an example, the court noted that, when Mother found the marital home in a state of filth with sharp instruments laying around, she chose to take pictures rather than take even some minor action toward correcting the problems, such as picking up the sharp instruments. Mother's family is exacerbating the problem by their natural allegiance to her and their disdain for Father's actions in taking sole custody of Scilar through the ex parte order. The court found that, going forward, Father was not likely to be as responsible and mature a parent as he should be, but it also found that, based on her past actions, Mother was not going to encourage Scilar's relationship with Father.

The court gave several specific directives before announcing the parenting arrangement. Both parties are to be attentive toward the skin irritation and cooperate with each other toward keeping the problem in check. Father is to attend counseling. Nevertheless, the court noted some concerns with the present counselor, including that she has become an advocate for Mother and that she has reinforced negative feelings Scilar may have against Father by hearing complaints about Father in Scilar's presence. Father has the option of choosing a new counselor. Father is not to leave Scilar alone in an automobile under any circumstances. Neither party is to consume an alcoholic beverage in Scilar's presence, nor are they to have her in the presence of any person that is under the influence of alcohol or drugs.

The child is to remain in the school system she has previously attended. Mother is the primary residential parent during the school year. Father will have parenting time during the school year every other weekend and every weeknight from the time Scilar gets out of school until he must go to work on work nights (6:00 p.m.) or until Mother gets off work (7:00 p.m.). During the summer, Father will be the primary residential parent. Mother has parenting time every other weekend and one week during the summer. Father has parenting time during two-thirds of the Christmas break and the full spring break. The parenting schedule will take effect with the beginning of the school year. The court will deviate downward from the Guidelines to account for the extra time Father will have the child after school, which time and the resulting expenses are not taken into account by the Guidelines. Neither of the parents shall have overnight guests of the opposite sex during parenting time.

The court directed counsel for Mother to prepare the order. When Mother's counsel had not prepared an order by the latter part of October, counsel for Father prepared and

submitted a written order which the court entered on December 17, 2010. The written order gave Father the option of choosing a new counselor within 30 days of entry of the order.

The same day, December 17, 2010, the court entered an order establishing the permanent parenting plan. The order found that the child spends 210 days with Mother and 155 with Father. The order stated that Father's gross monthly income is $2,071.42 and Mother's is $1,232.31. The court set Father's child support obligation at $175 monthly based on a presumptive obligation per the child support worksheet of $204 per week and a $29 deviation "based upon the time the Father has with the child every day after school and in consideration of the care and support (meals, etc.) that Father will provide daily during that time."

In the meantime, Mother had filed an 18-page motion asking the court for clarification of certain parts of its order or, alternatively, that the court hold Father in contempt. The substance of the motion was an itemization of things Father had allegedly done in violation of the spirit, if not the letter, of the court's bench ruling on July 1, 2010. For example, Mother stated that Father had not moved from his parents' home as he had stated at trial he would and that Father had endangered the child by running out of gas and then allowing the child to be in the vehicle while it was being pushed to a gas station.

After entry of the order in December 2010, Mother filed a motion asking the court to grant a new trial and alter or amend the judgment. The motion raised issues as to things that happened both before and after trial that allegedly show that Father is irresponsible and should not have received as much parenting time with the child as he did. Mother appears also to have re-filed her motion for clarification or contempt along with Mother's affidavit that everything stated in both motions was true. Mother filed sworn addenda to each motion.

After a hearing that occupied the better part of two days, the court ruled on Mother's various motions in an order entered May 4, 2011. As to parenting time, the court stated:

> Under the parenting time arrangement ordered by the court, the court finds that the number of days allocated to each parent was in error. Having recalculated the parenting time allocation pursuant to [M]other's motion, the court finds that [F]ather has 113 days of shared parenting time and [M]other enjoys 252 days of shared parenting time each year. In making and reconsidering, the parenting time allocation the Court considered all of the required factors set forth in T.C.A. § 36-6-404(b) at the trial, as well as in this motion hearing. For the reasons originally set forth in this court's ruling at trial, as well

-8-

as for the reasons set forth by this court in the ruling on these motions (which transcript is attached hereto and incorporated herein), the court FINDS that it is in the child's best interest that the parenting time be divided as previously ordered and all motions/requests to reconsider the parenting time allocation are DENIED.

(Capitalization in original.)

Using the corrected numbers for parenting time, the court recalculated Father's child support obligation and found that it was $314 per month before any departure. The court did award a downward deviation based on the following reasoning:

Under the terms of the Amended Parenting Plan, [F]ather is responsible for the child for several hours on school days when he is not the residential parent. He gets no credit in the child support calculation for the hours he spends taking care of the child after school and before he leaves for work, during which time he is responsible for the child and to provide for her needs, including shelter, heat and air, snacks, meals, drinks and transportation. In addition, the parties avoid any potential need for child care expenses . . . as a result of father caring for the child during these hours. Since these matters are not taken into consideration by the child support guidelines, the court finds that a downward deviation from the child support guidelines is appropriate in the amount of $30 per month and therefore sets child support at the amount of $284 per month, . . . plus the additional amount to satisfy the arrearage . . . .

The court found an arrearage of $1,873 based on a stipulation and ordered Father to pay $50 per month toward the arrearage. In its original order, the court alternated the tax exemption from year to year. Upon reconsideration, the court awarded the exemption to Mother each year.

Mother had asked the court to remove Father's designation as primary residential parent during the summer months. The court denied Mother's request. The transcript reflects that the court felt there was no substantive effect to the designation and that it helped to foster Father's involvement as a parent. The court denied Mother's request for more parenting time with Scilar during summer and Christmas break. In her various motions, Mother had complained that Father was haphazard about picking up the child from school

and that she would randomly receive a telephone call advising her that Father could not pick the child up. The court revised its previous order to require that Father make dependable arrangements for pick-up and notify Mother at least 24 hours in advance if he is not able to pick up the child after school. The court also ordered that Father give 24 hours advance notice whether he would be returning the child to Mother at 6:00 p.m. or 7:00 p.m. Mother had asked that Father not be allowed to permit anyone in his family to pick up the child. The court denied Mother's request, stating, "the court recognizes that the necessities of life and work often require us to utilize others to assist in our parenting responsibilities, particularly when parenting apart; and, the court recognizes the valuable nature of developing relationships with extended family members in the life of a child." The court clarified its previous order as to counseling so as to order "that [F]ather shall participate in/support at least twelve additional sessions of counseling for the child (and the parents if recommended by the counselor)." The court overruled Mother's request to be the sole decision maker with regard to certain parental decisions. The court further ordered that "each parent may choose one activity per year" and "the other parent will support that activity by splitting any related expenses evenly and ensuring that the child is at all scheduled events related to the extra curricular activity, no matter who is enjoying patenting time with the child at that time."

Mother asked the court to modify the property division by holding Father responsible for mortgage payments that were not made while he occupied the marital home without Mother. The court denied the request and reiterated that it had made an equitable division of the marital property in its previous order. Mother had asked that Father be ordered to immediately pay the debt he owed Mother's grandmother on the truck. The court held that Father had until April 30, 2011, to satisfy the obligation after which the grandmother "can avail herself of any collection action desired." As to any other issues raised in Mother's various motions, the court denied them and specifically found that Father "is not found in contempt at this time."

II.

Mother articulates the following issues, which we have repeated verbatim:

> Did the Trial Court abuse its discretion . . . by not naming the Mother as the only Primary Residential Parent?
>
> Did the Trial Court err in awarding the Father parenting time every other weekend and every school day, from 3:00 pm until 7:00 pm . . . [a]nd . . . in ruling Father would receive two thirds of Christmas Break and all of Spring Break, each year?

Did the Trial Court err by naming Father as the Primary Residential Parent in the summer . . . and in awarding Mother only every other weekend parenting time with the minor child?

Did the Trial Court err in excluding Mother's proffered trial testimony of the Father's physical abuse of her, during the marriage, which is a factor and a legal standard found at Tenn. Code Ann. Section 36-6-404 (12) to be used in establishing a parenting plan and a residential schedule for a child [and] . . . in allowing the Father to introduce a letter Mother wrote to another man during the marriage . . . ?

Did the Trial Court err in deviating from the Child Support Guidelines to offset . . . expenses [Father] may incur, during his parenting time, after school from 3:00 until 7:00 pm?

Did the Trial Court err in not assessing any of the mortgage or house payments, from November, 2009, until [Father] vacated the marital residence on April 15, 2010, although [Father] lived there exclusively, with the parties' minor child?

III.

In her 43-page brief, Mother fails to address the first issue other than in her statement of the issues and occasional statements interspersed at random points throughout her brief. She fails completely to cite any legal authority for the proposition that the court erred in naming Father as primary residential parent for the summer. Nevertheless, Father has made three key concessions which require us to modify the trial court's order to make Mother the sole primary residential parent and to remove that designation as to Father in the summer. Father concedes that the law requires courts to designate a primary residential parent in the parenting plan. *Estes v. Estes*, No. M2010-02554-COA-R3-CV, 2011 WL 4729862 at *8 (Tenn. Ct. App. M.S., filed Oct. 7, 2011)(*citing* Tenn. Code Ann. § 36-4-402(5)). He also concedes that, if the child resides with one parent "more than fifty percent (50%) of the time," that parent must be the primary residential parent. *Id*. (*citing* Tenn. Code Ann. § 36-6-402(4)). Finally, Father concedes that there can be only one primary residential parent. *Id.* Mother's reply brief does at least cite *Estes* and Father's concessions. Accordingly, based on the concessions by Father, and despite the deficiencies in Mother's brief, we are compelled to follow the law and modify the parenting plan to designate Mother as the sole primary residential parent and remove that designation from Father.

-11-

Mother repeats her pattern on the second issue of leaving it up to us to find reasons and authority for reversing the trial court. As we understand her argument, she believes that all the mistakes Father has made show her to be the better parent and that she should have the majority of the parenting time with the child. Apparently, that also means that Father should not pick the child up from school and spend time with her until later that afternoon when either Father goes to work or Mother gets off work. Father, again, has come to the rescue by at least providing us with the standards by which we review a trial court's allocation of parenting time:

> We review residential parenting decisions *de novo* on the record, presuming that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). Because these decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings, trial courts are given broad discretion to fashion appropriate arrangements that best suit the unique circumstances of a given case. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Given the broad discretion given to trial courts in making residential parenting decisions, we are reluctant to second-guess a trial court's determination in such matters. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001). . . . "A trial court fails to exercise its discretion properly when its decision is not supported by the evidence, when it applies an incorrect legal standard, when it reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." [*Owens v. Owens*, 241 S.W.3d 478, 496 (Tenn. Ct. App. 2007)] *(quoting Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005)).

*Brown v. Brown*, No. M2008-00788-COA-R3-CV, 2009 WL 1362307 at *3 (Tenn. Ct. App. M.S., filed May 14, 2009). In her reply brief, Mother offers the following short paragraph as her argument related to this issue:

> The Trial Court's ruling is most perplexing, in that [Father] did nothing, in conformance with or an intention to obey any of the Trial Courts [sic] instructions – especially relating to family counseling, and the best opportunity for his child from March 19, 2010 until July 1, 2010.

Mother falls woefully short of showing an abuse of discretion by the trial court with regard to the parenting schedule. We note that Mother conceded numerous times in the trial court, and so testified, that Father should have time with his daughter. The parenting schedule as set by the trial court allows Mother almost two-thirds of the parenting time. The record fully supports the trial court's factual findings that both parties have shortcomings as parents. A court should not judge a parent by the standard of perfection. *Shofner v. Shofner*, 181 S.W.3d 703, 716 (Tenn. Ct. App. 2004). Mother's letter to her male boarder showed a willingness to substitute an incarcerated lover in place of Father on a whim. Mother's shortcomings as a parent were, as the trial court found, exacerbated by her entire family who felt that Father had done her wrong by taking temporary sole custody of Scilar. They were so willing to find wrong in him after that, even though they felt he was a good parent and a good person before the separation, and even though none of family had seen him drink in the presence of Scilar, much less seen him intoxicated. Nevertheless, they all testified that he has a drinking problem which should result in a restriction of his parenting time. The trial court stated that it had considered the statutory factors found at Tenn. Code Ann. 36-6-404(b)(2010)[1] in making its determination. The trial court also expressed a regret that often fathers more or less fade into the background after a divorce and a desire to avoid that outcome in this case by structuring the parenting plan to promote a strong relationship with Father. This is fully in accord with our recognition in *Shofner* that "[c]ourts must strive to devise parenting plans that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making." 181 S.W.3d at 715. We hold there was no abuse of discretion with regard to the parenting schedule. This holding applies with equal force to the part of Mother's third issue that challenges the restriction of Mother's summer parenting time to every other weekend.

Mother's fourth issue was not preserved for appeal. She posits that the trial court erred in "excluding Mother's proffered trial testimony of . . . Father's physical abuse of her, during the marriage, which is a factor and a legal standard found at Tenn. Code Ann. [§] 36-6-404 (12)." There is no specific argument related to this issue and no citation by Mother to exactly where in the record the error occurred. In the absence of such we have reviewed the entire transcript and found one place in the record where Mother's sister attempted to testify about Father mistreating Mother in some vague manner several years before the separation. Father objected to the relevance of the testimony and the court sustained the objection, noting that Father's counsel had questioned Mother at length about any failings he had as a husband or a father and that Mother had not mentioned any physical abuse. Counsel for Mother moved to a new line of questioning and did not make an offer of proof

---

[1]There are 16 non-exclusive factors listed in Tenn. Code Ann. § 36-6-404(b) (2010) that courts are to consider in deciding the best interest of a child with regard to parenting time. It will serve no purpose in this case to list those factors.

so as to preserve the issue for appeal. "[I]t is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible." *Harwell v. Walton,* 820 S.W.2d 116, 118 (Tenn. Ct. App. 1991)(*quoting* **State v. Goad**, 707 S.W.2d 846, 853 (Tenn.1986)). The failure to make an offer of proof in this case prevented the trial court, and now us, from determining whether the sister's testimony was something other than the same type of exaggeration by which Mother's entire family testified that Father had a "drinking problem." We hold that Mother waived the issue by her failure to make an offer of proof.

Mother asserts that the trial court erred in allowing her to be examined regarding the contents of her letter expressing her love and Scilar's affection toward her later incarcerated male boarder. She seems to argue that since the trial court excluded her proof of bad acts on the part of Father, *i.e.*, the alleged abuse, it should have prohibited any questions related to her bad acts with the male boarder. Mother however, overlooks the fact that her counsel did not object to Mother being questioned about the letter, but Father's counsel did object to Mother's sister being questioned about alleged abuse that happened long before the separation. Since Mother's counsel did not object to the testimony, any error in its admission was waived. **Grandstaff v. Hawks**, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000). Mother also overlooks the fact that Father was able to tie the relevance of his questions directly to its effects on the child and whether or not the loss of another male with whom the child had bonded was having an impact on the child's relationship with Father.

Mother raises the issue of whether the trial court erred in deviating from the Guidelines by allowing Father a downward departure of $30 per month for expenses he will incur in parenting the child after school. She provides no intelligible discussion in her initial brief. In her reply brief Mother argues that "[t]his very matter (calculating 'a day' for child support purposes), has been addressed by this very Court of Appeals. (See [*State v. Elder*, No. E2008-02487-COA-R3-JV, 2009 WL 1676010 (Tenn. Ct. App. E.S., filed June 16, 2009)])." *Elder* is readily distinguishable. In *Elder*, the father testified that he visited with his child for five or six hours a day even on days when he was not awarded parenting time. *Id*. at *1. The trial court concluded that the father spent approximately 38 hours per week, which the court extrapolated to equal 3 days per week and 156 parenting days per year. *Id*. at *2. The trial court set the father's support obligation in *Elder* based upon parenting by the father for 156 days. This court reversed based on our holding that the guidelines define a day of parenting time as "more than twelve (12) consecutive hours in a twenty-four (24) hour period." *Id*. at *3 (*quoting* Tenn. Comp R. & Regs. 1240-2-4-.02(10)). Since none of the father's time with the child exceeded 12 consecutive hours, we held that the father exercised "no 'days' with the child . . . for purposes of the calculation of child support obligations. . . . "*Id*. at *4. *Elder* did not involve a deviation with respect to what is at issue in this case. *Elder* did not hold that time regularly spent with a child that does not qualify as a "day"

cannot be the basis of a departure. The court in the present case in fact noted that the time Father spends with the child after school does not qualify as a "day" of parenting time but that it nevertheless saves the separated family the expense of child care and costs Father money. We hold that *Elder* does not control the present case. Accordingly, we find no abuse of discretion by the trial court in allowing Father a small deviation based on his time spent with Scilar after school.

Mother's final issue is whether the trial court erred in "not assessing any of the mortgage or house payments, from November, 2009, until [Father] vacated the marital residence on April 15, 2010 . . ." Mother does not discuss this issue intelligibly in her initial brief. From her reply brief, we discern that she thinks Father should have paid someone, either her or her grandmother, a reasonable rent while he was residing in the mobile home and she was excluded. We believe that the trial court correctly treated the mobile home and lot as a marital asset and that the court made an equitable division of the asset, the result of which was to award Mother approximately $10,000 in net marital assets and Father none. In *Miller v. Miller*, 336 S.W.3d 578, 587 (Tenn. Ct. App. 2010), we noted:

> A trial judge has wide discretion in fashioning an equitable division of marital property, and we accord great weight to that division. *Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001). The process is not mechanical, but there are factors set out in Tenn. Code Ann. § 36–4–121(c) (2005) that the court must consider. *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003).

We hold that the evidence does not preponderate against the trial court's findings of fact, that its division of property is not at odds with the statutory factors, and that the trial court did not err in its division of the marital estate.

IV.

The judgment of the trial court is modified in part and affirmed as modified. The parenting plan is amended to reflect that Mother is the primary residential parent and that Father is, therefore, not a primary residential parent. The judgment of the trial court is otherwise affirmed in all respects. Exercising our discretion, we tax the costs on appeal to the appellant, Kandi Tonyelle Morgan. This case is remanded, pursuant to applicable law, for enforcement of the judgment as modified and for the collection of costs assessed in the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE